**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| IMA North America, Inc., | ) | No. CV-06-344-PHX-LOA |
| Plaintiff/Counterdefendant, | ) | **ORDER** |
| vs. | ) | |
| Maryln Nutraceuticals, Inc., d/b/a Naturally Vitamins, | ) | |
| Defendant/Counterclaimant. | ) | |

This matter arises on Plaintiff/Counterdefendant IMA North America, Inc.'s ("IMA") Motion to Exclude the Report and Testimony of Damian Hillseth. (docket # 101) Defendant/Counterclaimant, Maryln Nutraceuticals, Inc. ("Maryln" or "Defendant") has identified Mr. Hillseth as an expert witness to testify regarding the value of the Comprima 230 at the time of purchase by Maryln. IMA claims that: (1) Mr. Hillseth is not qualified to testify as an expert; (2) his opinion is unreliable; and (3) he is not qualified to render an opinion regarding lease terms. (docket # 101)

After considering the parties' briefing, evidence, and the relevant case law, the Court will grant the motion and will exclude the report and expert testimony of Mr. Hillseth. The Court declines to conduct an evidentiary hearing on the pending motion because the evidence in the record is sufficient to support a ruling on the motion and the parties expressly advised the Court during a bench trial on the merits of this case that the record before the Court contains all of the evidence and arguments which counsel wish to present on the

1  pending motion. *Weinstein's Federal Evidence* § 702.02 (stating that "[a]n evidentiary
2  hearing is not required if the information before the court if sufficient to support a ruling on
3  the reliability of the proposed evidence.").

4  **I. Background**

5     Plaintiff/Counterdefendant IMA, the vendor of a Comprima 230 tablet press
6  ("press") manufactured in Italy by IMA S.P.A., a separate corporation, brings this payment-
7  deficiency action against Defendant Marlyn, d/b/a Naturally Vitamins, the purchaser of the
8  press and a manufacturer of vitamins and other tablets for sale.

9     On April 30, 2004, IMA faxed a purchase order ("the Comprima Purchase
10 Order) to Marlyn pursuant to which Marlyn agreed to: (1) purchase a Comprima 230 from
11 IMA for $585,000 (including delivery) plus a trade-in of an S 250 Killean tablet press IMA
12 had sold to Maryln in 2000; (2) pay a down payment of 40 % of the purchase price
13 ($234,000); and (3) pay the balance in full upon delivery of the Comprima 230 to Maryln's
14 Phoenix warehouse. (Complaint ¶ 6, Answer ¶ 6)  IMA alleges claims of breach of contract
15 and unjust enrichment. IMA contends that, although Marlyn paid the down payment
16 ($234,000), it breached the Comprima Purchase Order by failing to pay the remaining
17 $351,000 owed for the Comprima 230. (Complaint at ¶ 8)

18    Marlyn denies any wrongdoing. It alleges that IMA proposed to sell, and
19 Marlyn intended to buy, a new and unused Comprima 230. It is undisputed that Marlyn paid
20 IMA the agreed upon down payment of $234,000 before delivery of the Comprima 230.
21 Marlyn claims that at or shortly after the delivery of the Comprima 230, Marlyn discovered
22 that the Comprima 230 was not the new tablet press it had agreed to purchase as evidenced
23 by, among others, rust, powder residue, and the age of the Comprima 230's parts.  Marlyn
24 alleges that "[a]t no time did IMA ever disclose to [Marlyn] that the [press] had been
25 manufactured in 1999, that it contained aged parts that were tested in 1999, that it had been
26 displayed and used [as a demonstration model] at a trade show in Germany in 2000, or that
27 it was at least four (4) years old. . . [and that Maryln] was led to believe that it was
28 purchasing a new [press]."  (docket # 77 at 4)  Marlyn counterclaims for breach-of-contract

1  damages and rescission of the purchase contract.

2  Maryln's proposed expert, Damian Hillseth, opines that the Comprima 230
3  that Marlyn received was valued at $225,000 at the time of purchase. (docket # 102, Exh.
4  1) Marlyn's counterclaim seeks $9,000.00 in damages, the difference between what Marlyn
5  paid for the press, $234,000.00, and its expert's valuation of the Comprima 230 at $225,000.

6  **II. Admissibility of Expert Opinions in Federal Court**

7  This Court has diversity jurisdiction over this lawsuit pursuant to 28 U.S.C.
8  § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and
9  costs, and the adverse parties are of diverse citizenship. 28 U.S.C. § 1332. (docket # 102
10 at 1) Pursuant to *Erie*, federal courts sitting in diversity apply state substantive law and
11 federal procedural law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Wray v. Gregory*,
12 61 F.3d 1414, 1417 (9th Cir.1995) ("Although the Federal Rules of Evidence ordinarily
13 govern in diversity cases, they do not always."). The parties agree that *Daubert v.*
14 *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), its progeny, and Federal Rule
15 of Evidence 702 govern the admission of expert testimony in this case.

16 Federal Rule of Evidence 702 governs the admissibility of expert testimony
17 and permits the presentation of "scientific, technical, or other specialized knowledge" if it
18 "will assist the trier of fact to understand the evidence or to determine a fact in issue."
19 Fed. R. Evid. 702. For expert testimony to be admissible, "(1) the testimony [must be]
20 based upon sufficient facts or data, (2) the testimony [must be] the product of reliable
21 principles and methods, and (3) the witness [must have] applied the principles and
22 methods reliably to the facts of the case." Fed.R.Evid. 702.

23 Before expert testimony can be admitted, the district court must ensure that
24 the proffered "expert's testimony both rests on a reliable foundation and is relevant to the
25 task at hand." *Daubert v. Merrill Dow Pharms*., 509 U.S. 579, 597 (1993). The Supreme
26 Court describes judges as "gatekeepers of evidence," *Daubert*, 509 U.S. at 597, whose
27 role is "to make certain that an expert, whether basing testimony on professional studies
28 or personal experience, employs in the courtroom the same level of rigor that character-

- 3 -

1 izes the practice of the expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526
2 U.S. 137, 152 (1999).   If an expert's proposed testimony fails to meet either the
3 "reliability" or "relevance" prong, it should be excluded. *United States v. Scholl*, 166 F.3d
4 964, 971 (9th Cir. 1999) (affirming exclusion of expert testimony as irrelevant); *Martinez*
5 *v. Terex Corp.*, 241 F.R.D. 631, 641, 2007 WL 951721, * 10 (D. Ariz., March 27, 2007)
6 (declining to address relevance of proposed expert testimony after finding that testimony
7 unreliable).

8 For purposes of Federal Rule of Evidence 702, the test for relevance is
9 "higher than the standard for bare relevance." *In re Paoli R.R. Yard PCB Litigation*, 35
10 F.3d 717, 745 (3rd Cir. 1994); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317
11 n. 17 (9th Cir. 1995) ("*Daubert II*") (explaining that Rule 702's "relevance" requirement
12 is not "merely a reiteration of the general relevancy requirement of Rule 402.")  Rather,
13 because expert testimony can be "both powerful and quite misleading because of the
14 difficulty in evaluating it," *Daubert*, 509 U.S. at 595, district courts must exclude
15 proffered expert testimony "unless they are convinced that it speaks clearly and directly
16 to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43
17 F.3d at 1321 n. 17.

18 The test for reliability focuses on the expert's "principles and
19 methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.
20 Proposed expert testimony "must be supported by appropriate validation - i.e. good
21 grounds, based on what is known." *Daubert*, 509 U.S. at 590.  The *Daubert* Court
22 provided a non-exclusive list of factors courts should consider in determining whether
23 scientific testimony is sufficiently reliable: (1) whether the method or technique has been
24 tested, (2) whether the method or technique has been subjected to peer review and
25 publication, (3) the potential or known rate of error, and (4) whether the method or
26 technique is generally accepted within the relevant scientific community.  *Id*. at 593-94;
27 *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) (stating that
28 "[s]cientific evidence is deemed reliable if the principles and methodology used by an

1  expert are grounded in the methods of science.") (citing *Daubert*, 509 U.S. at 589-95).
2  Accordingly, the expert's method must be adequately explained.  *United States v.*
3  *Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).
4          After *Daubert*, in *Kumho Tire Co.*, 526 U.S. 137 (1999), the Supreme Court
5  explained that the district court's gatekeeping role applies to all forms of expert
6  testimony, not just scientific testimony." 526 U.S. at 148.  The *Kumho* Court explained
7  that the factors identified in *Daubert* may not be pertinent in assessing reliability in all
8  cases.  Rather, the circumstances and issues of each case will determine which factors
9  apply.  *Id*.  The objective of *Daubert's* gatekeeping inquiry is to "make certain that an
10 expert, whether basing testimony upon professional studies or personal experience,
11 employs in the courtroom the same level of intellectual rigor that characterizes the
12 practice of an expert in the relevant field." *Id*. at 152.  In *Daubert*, the Court further held
13 that "vigorous cross-examination, presentation of contrary evidence, and careful
14 instruction on the burden of proof are the traditional and appropriate means of attacking
15 shaky but admissible evidence."  *Id*. at 588.
16         Discussing *Daubert* and *Kumho Tire*, the Ninth Circuit has stated that, "far
17 from requiring trial judges to mechanically apply the *Daubert* factors . . . to both
18 scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are
19 entitled to broad discretion when discharging their gatekeeping function."  *United States*
20 *v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  The Ninth Circuit has held that the "trial
21 court not only has broad latitude in determining whether an expert's testimony is reliable,
22 but also in deciding *how* to determine the testimony's reliability." *Elsayed Mukhtar  v.*
23 *California State University, Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002) (emphasis in
24 original) (citing *Hankey*, 203 F.3d at 1167).
25         In determining whether a proffer of expert testimony is sufficiently reliable,
26 the Ninth Circuit has "held that '[o]ne very significant fact to be considered is whether
27 the experts are proposing to testify about matters growing naturally and directly out of
28 research they have conducted independent of the litigation, or whether they have

- 5 -

developed their opinions expressly for purposes of testifying.'" *Clausen*, 339 F.3d at 1056 (citing *Daubert II*, 43 F.3d at 1317). "If the testimony is not based on independent research then what is required is 'proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.'" *Id*.

If neither of *Daubert II*'s two primary criteria (expert's testimony is based on independent research or proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication) for establishing the reliability of expert testimony is met, "a proffer of scientific testimony may still be deemed reliable enough to be admitted." *Clausen*, 339 F.3d at 1056. "Where peer review and publication are absent, 'the experts must explain precisely how they went about reaching their conclusions and point to some objective source - a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like - to show that they have followed the scientific evidence method, as it is practiced by (at least) a recognized minority of scientists in their field.'" *Id*. (recognizing that a "differential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*.") (citations omitted); *Heck v. City of Lake Havasu*, 2006 WL 2460917 *8 (D. Ariz., April 24, 2006).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (trial judge did not abuse her discretion when she concluded that the studies upon which Joiner's experts relied were not sufficient, whether individually or in combination, to support their conclusions that Joiner's exposure to PCB contributed to his cancer). In *Joiner*, the Supreme Court held that *Daubert* not only applies to the "principles and methodology" of the expert, but also to any conclusions the expert

- 6 -

1  reached. *Id*. Because "conclusions and methodology are not entirely distinct from one
2  another" and "[t]rained experts commonly extrapolate from existing data," a district court
3  "may conclude that there is simply too great an analytical gap between the data and the
4  opinion proffered." *Id*.

5  The party proffering an expert bears the burden of establishing that the
6  pertinent admissibility requirements are met by a preponderance of the evidence. *Joiner,*
7  522 U.S. at 144; *Domingo v. T.K. M.D.*, 289 F.3d 600, 607 (9th Cir. 2002); *Lust v.*
8  *Merrell Dow Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). In performing its
9  "gatekeeper" responsibilities, a district court is not obligated to conduct a separate
10 evidentiary hearing on the admissibility of the proffered expert testimony. *United States*
11 *v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2002) ("Nowhere in *Daubert*, *Joiner*, or
12 *Kumho Tire* does the Supreme Court mandate the form that the inquiry into relevance and
13 reliability must take, nor have we previously spoken to this issue.").

14 Mindful of the foregoing principles, the Court will consider the qualifi-
15 cations of the proffered expert witness, Damian Hillseth, and the admissibility of his
16 opinions and testimony.

17 **III.  Defendant's Expert Witness - Damian Hillseth**

18 **A. Mr. Hillseth's Qualifications to Proffer Expert Opinions**

19 To testify as an expert, an individual must be qualified by "knowledge,
20 skill, experience, training, or education." Fed.R.Evid. 702.  A witness may qualify as an
21 expert based on reliable evidence, including deposition testimony. *See* 4-702 Weinstein's
22 Federal Evidence § 702.02. Rule 702 "contemplates a broad conception of expert
23 qualifications . . . [and] is broadly phrased and intended to embrace more than a narrow
24 definition of qualified expert." *Thomas v. Newton International Enterprises*, 42 F.3d
25 1266, 1269 (9th Cir. 1994) (finding that expert's 29 years of longshoreman experience laid
26 at least minimally sufficient foundation of knowledge, skill, and experience required to
27 give expert testimony regarding working conditions of longshoreman personnel).

28 As discussed below, Mr. Hillseth's experience buying and selling

- 7 -

1 manufacturing equipment in the pharmaceutical and nutraceutical industries qualifies him
2 as an expert to testify regarding the value of the Comprima 230 at issue.  Mr. Hillseth
3 graduated from Loyola Marymount College in 1980 and began a career in the pharma-
4 ceutical and nutraceutical industry buying and selling manufacturing equipment for
5 Mustang Machinery.  (docket # 108, Hillseth depo. at 7)   In 1983, he went to work for
6 Sundance Supply buying and selling used equipment in the microelectronic industry.
7 (*Id.*)  After short break from the industry, in 1985, he went back to work for Mustang
8 Machinery.  (*Id.* at 8)  In 1990, Mr. Hillseth started his own company, Star Industries,
9 which buys and sells used machinery in the pharmaceutical, biotechnical, cosmetic,
10 chemical, and nutraceutical businesses.  (docket # 108, Hillseth depo. at 7-8)  In
11 connection with his business, Mr. Hillseth buys, sells, and appraises machinery.  (Hillseth
12 depo. at 12)

### 1.  Value of Comprima 230

14 Mr.  Hillseth's experience in the business of buying and selling equipment
15 in the pharmaceutical industry qualifies him to give expert testimony regarding the value
16 of the Comprima 230 at issue in this case.  IMA contends that Mr. Hillseth is not
17 qualified to give an opinion as to the value of the Comprima 230 because he lacks
18 "formal education regarding valuation of pharmaceutical equipment . . . ."  (docket # 101
19 at 3)   Mr. Hillseth's lack of specific training does not disqualify him as an expert.
20 *Rogers v. Raymark Industries, Inc*., 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can
21 qualify as an expert through practical experience in a particular field, not just through
22 academic training.") (citation omitted).  IMA's  overemphasis on qualifications is
23 inconsistent with the liberal approach to expert witness qualification taken by Rule 702.
24 *Holbrook v. Lykes Brothers Steam Ship Co., Inc.*, 80 F.3d 777, 782 (3rd Cir. 1996).

### 2.  Lease Terms

26 In his report, Mr. Hillseth also offer opinions regarding lease rates for the
27 Comprima 230.  He opines that if the Comprima 230 was leased on a monthly or annual
28 basis, the price quote attached to his report would apply.  (docket # 102, Exh. 1)  IMA

- 8 -

contends that Mr. Hillseth is not qualified to testify regarding lease terms. The Court need not resolve this issue because Marlyn advises the Court that it does not intend to offer Mr. Hillseth for any opinions regarding the fair lease value of the press. (docket # 108 at 6, n. 5)

### B. Reliability of Mr. Hillseth's Opinion regarding Value of the Comprima 230

Although Mr. Hillseth is qualified as an expert to testify regarding the value of the Comprima 230 at issue, his opinion regarding that value is unreliable. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318. Accordingly, "[o]ffering only a bottom line conclusion does not assist the trier of fact and should not be admitted." *Pizel v. Monaco Coach Corp.*, 374 F.Supp.2d 653, 655 (N.D. Ind. 2005) (citing *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir.2005)); *Smith v. Freightliner*, LLC, 239 F.R.D. 390, 392-93, 2006 WL 3299753, at * 3 (D.N.J. 2006) (holding that when an expert's opinion is not based on discernable methodology, the opinion must be excluded).

Here, Mr. Hillseth's value of the Comprima 230 at issue is based on his review of "documents and information" and not a physical inspection of that machine. (docket # 101, Exh. 1) The lack of a physical inspection, however, is not significant because reliable appraisals may be rendered solely based upon photographs and records pertaining to the item at issue. *Pizel*, 374 F.Supp.2d at 657 (holding that while a valuation is more precise when a physical inspection occurs, the lack of a physical inspection does not render the opinion unreliable). Indeed, an expert may rely on data that is not within his personal knowledge when forming his opinion. Fed.R.Evid. 702; *United States v. Locascio*, 6 F.3d 924, 938 (2nd Cir. 1993) (stating that "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions.").

Mr. Hillseth opines that the Comprima 230 delivered to Marlyn was valued at $225,000. Mr. Hillseth's opinion is not "the product of reliable principles and methods

1 that are reliably applied to the facts of the case." *Masterson Marketing, Inc., v. KSL*
2 *Recreation Corp.*, 495 F.Supp.2d 1044, 1051 (S.D.Cal. 2007).  Indeed, Mr. Hillseth has
3 not adequately explained his methodology for arriving at the value of the Comprima 230
4 at issue.  He states that when he appraises a machine he relies on age, condition,
5 marketability and location of the machine and then defines those terms.  (Hillseth depo.
6 33)   Mr. Hillseth concluded that a machine that had been turned on for ten hours would
7 be considered used and that he considered the Comprima 230 tablet press at issue a
8 "demoed" machine.  (Hillseth depo. at 59, 60)   He testified that when determining the
9 value of a tablet press machine, whether it has been demonstrated by producing a tablet at
10 a trade show would affect its value.  (Hillseth depo at 57-58)  And that the machine would
11 have a lower value if it had produced a tablet.  (Hillseth depo. at 59)

12 Although Mr. Hillseth testified that whether the Comprima 230 had been
13 run to produce tablets would affect its value, he stated that he valued the Comprima 230
14 "as a demoed machine" without regard to "whether it made tablets or it didn't."  (Hillseth
15 depo. at 59-60)  Thus, even if part of Mr. Hillseth's methodology included consideration
16 of the condition of the machine, he did not apply that methodology in this case.

17 Mr. Hillseth's methodology is not reliable because he did not perform
18 research of comparable sales to determine what a Comprima 230 tablet press with the
19 options included on the machine at issue would be worth.  *Stoebner Holdings, Inc. v.*
20 *Automobili Lamborghini S.P.A.*, 2007 WL 4230878, * 5 (D. Hawaii, Nov. 30, 2007)
21 (finding certain aspects of an expert's valuation of a 2002 Lamborghini Murcielago
22 automobile reliable where expert conducted research on other Lamborghinis offered for
23 sale on the internet to determine that a vehicle with no repairs would be worth
24 approximately $200,000).   Additionally, Mr. Hillseth did not consult industry standard
25 guides or similar publications.  *Long v. Monaco Coach Corporation*, 2007 WL 4613000,
26 * 3 (E.D. Tenn., Sept. 27, 2007) (finding expert's testimony regarding value of motor
27 coach was reliable where expert's methodology included "consulting industry standard
28 guides . . ., researching comparable sales, and consulting the purchase order of the motor

- 10 -

1  coach at issue.")

2          Assuming *arguendo* that Mr. Hillseth's methodology itself was reliable, he
3  did not reliably apply that methodology to the facts of this case.  In arriving at the value
4  of the Comprima 230 at issue, Mr. Hillseth merely considered a bare bones machine
5  without any of the options or other extras, such as an 18-month warranty, specific to the
6  machine which Marlyn had ordered.  Specifically, the Comprima 230 sold to Marlyn was
7  customized with options which Marlyn selected.  (docket # 101, Exh. 4)  The Comprima
8  Purchase Agreement also provided an 18-month extended warranty, six months longer
9  than the standard IMA warranty; at least, two weeks of training by IMA personnel at
10 Marlyn's Phoenix warehouse; and the installation of the Comprima 230 at Marlyn's
11 warehouse.  (docket # 101, Exh. 4)

12         Mr. Hillseth testified that a machine sold by an original equipment seller,
13 such as IMA, would be valued differently than a machine sold by a third-party used
14 equipment dealer.  However, Mr. Hillseth valued the Comprima 230 at issue as if it was
15 sold by a third-party used equipment dealer.  (Hillseth depo at 86-87)  He explained that
16 the valued "the machine itself" with "no warranty, no spare parts, [and] no service."  (*Id.*
17 at 87)  Specifically, Mr. Hillseth did not consider the value of all of the options that IMA
18 included on the Comprima 230 at Marlyn's request.  (Hillseth depo. at 81-83)   These
19 options include the additional charge (item 1004), software package (item 1010), single
20 station size parts (item 1011), embossing tool (item 1012), table draw-off unit (item
21 1014), PVC tooling box (item 1015), automatic washing group (item 1017), packing,
22 shipping, and installation.  (Hillseth depo. at 81-83; docket # 101, Exh. 4)

23         Mr. Hillseth also did not consider the value of the 18-month warranty which
24 IMA provided on the Comprima 230 at issue.  (Hillseth depo. at 87-88)   Mr. Hillseth
25 testified that a warranty "absolutely" has some value, but stated that he did know, or
26 consider, the value of the warranty that was part of the Comprima Purchase Agreement.
27 (Hillseth depo. at 88, 90-91)   Mr. Hillseth further testified that he did not include the
28 value of the two weeks of training IMA provided with the Comprima 230.  (Hillseth depo

- 11 -

at 98)   In fact, Mr. Hillseth testified that he did not know if IMA would provide training on the Comprima at issue.  (*Id*. at 98)

In summary, Mr. Hillseth has not adequately explained the methodology he used to arrive at the value of the Comprima 230.  *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (stating that expert's methods must be adequately explained); *Daubert II*, 43 F.3d at 1319 (holding that the expert must "explain the methodology . . . followed to reach [his or her] conclusions.").  Additionally, his opinion regarding the value of the Comprima 230 at issue fails to take into account all of the factors which affect the value of that machine, including the options, the warranty, and training.  Mr. Hillseth simply did not value the machine at issue in this case, and therefore, his opinion is not reliable.  *See Stoebner Holdings, Inc.*, 2007 WL 4230878, * 5 (finding expert's opinion "inadmissible to the extent that it addresses problems with the vehicle that are not at issue in this action."). Mr. Hillseth's  opinion on the value of the Comprima 230  is simply the *ipse dixit* of  Mr. Hillseth without any independent research of comparable sales to determine what a used or demonstrated Comprima 230, or any model of Comprima, tablet press would be worth.  *Joiner*, 522 U.S. at 146-47;  *Automobili Lamborghini S.P.A.*, 2007 WL 4230878 at * 5.

Accordingly,

**IT IS ORDERED** that Plaintiff/Counterdefendant IMA North America, Inc.'s Motion to Exclude the Report and Testimony of Damian Hillseth, docket # 101, is **GRANTED**.

Dated this 17th day of October, 2008.

Lawrence O. Anderson
United States Magistrate Judge