**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| IMA North America, Inc., | ) | No. CV-06-0344-PHX-LOA |
| Plaintiff, | ) ) | **FINDINGS OF FACT,** |
| vs. | ) ) | **CONCLUSIONS OF LAW AND ORDER** |
| Marlyn Nutraceuticals, Inc., d/b/a Naturally Vitamins, | ) ) ) | |
| Defendant. | ) ) | |

This matter was tried to the Court over seven days, beginning on October 14, 2008. (docket # 118) The parties recently submitted proposed findings of fact and conclusions of law.[1] Pursuant to Fed.R.Civ.P. 52(a), the Court hereby enters its findings of fact and conclusions of law.

**I. Jurisdiction**

The Court has subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the adverse parties are diverse of citizenship. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(a). All parties have previously consented in writing to magistrate-judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (docket ## 12, 16)

"[F]ederal courts sitting in diversity jurisdiction apply state substantive law and

---

[1] Thereafter, IMA filed a Notice of Errata, correcting several typographical errors. (docket # 162) The Notice of Errata did not make any substantive changes to IMA's proposed findings of fact and conclusions of law or IMA's closing brief.   (docket ## 160, 161 and 162)

1   federal procedural law." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003);

2   *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The parties agree Arizona's substantive law

3

4   (Arizona's Uniform Commercial Code) ("U.C.C."), A.R.S. § 47-2101 *et seq*., applies to this

5   diversity, breach-of-contract action.  (docket # 120 and # 121)

6   **II. Background**

7           Plaintiff IMA North America, Inc. ("IMA") brings this action against

8   Defendant Marlyn Nutraceuticals, Inc., d/b/a Naturally Vitamins ("Marlyn").  On April 30,

9   2004, Marlyn submitted a faxed purchase order, dated February 19, 2004, per quotation #

10  11000052103 to IMA by which Marlyn agreed to: (1) purchase a Comprima 230 tablet press

11  (the "Machine") from IMA for $585,000 (including delivery) plus a trade-in of a Kilian S-250

12  tablet press; (2) pay 40 % of the purchase price ($234,000) as a down payment; and (3) "pay

13  the full amount upon [the press'] arrival" at Marlyn's facility in Phoenix. (docket # 1 at ¶¶ 6-7;

14  docket # 8, ¶¶ 7-8; Exhs. 15 and 20[2]) IMA alleges breach of contract (Count I) and unjust

15  enrichment (Count II) based on Marlyn's failure to pay the remaining balance owed for the

16  Comprima 230 that Marlyn purchased from IMA in 2004, and for other items and equipment

17  ("Additional Items") that Marlyn purchased from IMA in 2004 and 2005.

18          Marlyn denies that it owes IMA any money.  Marlyn filed a counterclaim for

19  breach of contract, alleging that the Comprima 230 sold by IMA was not "new."

20          IMA argues it is entitled to judgment on Marlyn's counterclaim.  IMA asserts

21  that Marlyn affirmed the agreement by requiring IMA to install the press, requiring IMA to train

22  Marlyn's employees for use of the press, requiring IMA to perform warranty work on the press,

23  and using the press for profit for several years after its delivery.

24          As discussed below, the Court finds in favor of IMA on its breach of contract

25  claim  (Count I) and, therefore, declines to consider IMA's alternative claim (Count II) for

26  unjust enrichment. The Court also finds in favor of IMA on Marlyn's counterclaim for breach

27  _____

28      [2] Citations to "Exhibit ___" are to exhibits admitted during trial in October 2008.

1    of contract.

2    **III. Findings of Fact**

3                            **A. Parties and Witnesses**

4                1.   IMA sells, installs and services tablet presses and other pharmaceutical

5    processing and packaging equipment for the pharmaceuticals, nutraceuticals, and other

6    industries and is the exclusive seller of IMA Italy machines in the United States.  (docket # 102[3]

7    at 6; Tr. 40, 45[4])

8                2.   IMA Italy, Industria Macchine Automatiche, S.P.A. ("IMA Italy"),  is

9    IMA's parent company.  (Tr. 44, 45, 46)   IMA Italy manufactured the Comprima 230 at issue

10   in this case at its facility in Bologna, Italy.  (Tr. 45)

11               3.   IMA Italy does not sell directly to customers in the United States.  (Tr. 45)

12   Rather, IMA receives prospective orders from its customers, and then gives the customer a

13   quote.  If the customer orders a machine, IMA purchases it from IMA Italy and then sells it to

14   the customer. (Tr. 45)  IMA receives a commission for selling IMA Italy's machines.  (Tr. 46)

15   IMA pays IMA Italy for the machine less IMA's commission.  (*Id.*)

16               4.  Marlyn manufactures and sells nutritional supplements (tablets and capsules)

17   under its trade name, Naturally Vitamins.  Marlyn also manufactures and sells capsules for its

18   customers under the customers' trade names, which Marlyn refers to as "contract

19   manufacturing." (docket # 102 at 6; Tr. 648, 908, 909)

20               5. One of the tablets which Marlyn produces and sells is called SAMe.  (docket

21   # 102 at 6, Tr. 648)  In 2003, Marlyn was manufacturing the SAMe tablets for its customer,

22   Gnosis, on Marlyn's Kilian S-250 tablet press.  (Tr. 648, 649)

23   _____

24          [3]  Docket # 102 is the parties Joint Pretrial Statement.  (docket # 102)

25          [4]  Citations to "Tr. __" are to the trial transcript which appears at docket numbers 137,
     139, 141, 143, 145, 147, and 149.  The page numbers refer to the page of the trial transcript,
26   rather than to the page numbers assigned by CM/ECF.  Docket # 137 contains pages 1-189;
     docket # 139 contains pages 190-366; docket # 141 contains pages 367-520; docket # 143
27   contains pages 521-623; docket # 145 contains pages 624-828; docket # 147 contains pages
     829-1015; docket # 149 contains pages 1016-1176.
28

1       6.  Gerard Krouchick has been IMA's Chief Financial Officer ("CFO) since

2   2001.  (Tr. 39, 41)

3       7.  William Crozier was the Director of IMA's Solid Dose Division from 2003

4   through 2007.  Crozier's duties included supervising sales people, and acting as service and

5   parts manager for the Solid Dose Division. (Tr. 1114, 1117) Crozier was Todd Benney's

6   manager.  (Tr. 144)

7       8.  Todd Benney was a sales representative for IMA during 2003 and 2004,

8   docket # 102 at 6, and was the sales representative for IMA in connection with the Comprima

9   230 at issue in this case.  (Tr. 144, 145) IMA fired Mr. Benney in 2004 or 2005 for reasons

10   unrelated to this case. (Tr. 145)

11       9.  Joaquim Lehmann is the owner of Marlyn.  (Tr. 670).  Lehmann was

12   Marlyn's President from the 1980s to the summer of 2006 when he became Marlyn's CEO.

13   (docket # 102 at 6, Tr. 908)

14       10.  Daniel Gulick began working for Marlyn in 1997 as a chemist.  (Tr. 644,

15   645) Gulick moved into sales for Marlyn at the end of 2001 or beginning of 2002, and he

16   became Marlyn's Director of Contract Manufacturing in 2003.  (Tr. 646-647)  Gulick's duties

17   include "procuring . . . new business," and Mr. Gulick was primarily responsible for Marlyn's

18   SAMe account with Gnosis.  (Tr. 647, 648, 893)

19       11.  Fabriano Ferrini has been employed by IMA Italy, in Bologna, Italy, as a

20   product manager since 1998.  (Tr. 434, 435; docket # 102 at 6)

21       12.  As a product manager, Ferrini follows the business of a certain line of

22   machines manufactured by IMA Italy, including new developments.  (Tr. 435, 436)  In 2004,

23   Ferrini was the product manager for IMA Italy's Comprima line of machines, including both

24   (i) the Comprima 230 machine at issue in this case that was offered for sale to Marlyn in Exhibit

25   15 (Quote II), and (ii) the Comprima 230 machine that was offered for sale to Marlyn in Exhibit

26   5 (the Quote I).  (Tr. 436, 439, 440)

27       13.  Luis Reyes is a technical engineer for IMA, and has been employed by

28   IMA since 2002.  (Tr. 249)  Reyes has installed and serviced tablet presses, including

Comprima machines manufactured by IMA Italy, for over ten years.  (Tr. 250, 251, 253, 256, 267)  Reyes installs new machines, performs preventative maintenance and repairs on machines, and trains personnel on the use of machines sold by IMA.  (Tr. 252)    Reyes serviced the machine at issue and trained Marlyn's operators on the use and maintenance thereof.  (Tr. 252, 253, 268, Exhibit 30; 270, 272, 296, 297, 300, 303, Exh. 35)

14.  Jose Torres is a technical engineer for IMA, and has been employed by IMA since 2000.  (Tr. 333)  Torres is in charge of installing machinery, training, repairing, and servicing machines sold by IMA, including Comprima machines.  (Tr. 334, 335)

15.  Torres has installed and serviced tablet presses, including Comprima machines manufactured by IMA Italy, for almost twenty years.  (Tr. 334)

16.  Torres spent over 120 hours over a two-week period installing, and training Marlyn's operators on the use and maintenance of the Machine at issue in this case.  (Tr. 335, 340, 344, 346, 348, 361, 363; Exhibit 26)

17.  Dean Harbison is currently Marlyn's technical services manager.  (Tr. 1048) At the time the Machine at issue was delivered to Marlyn's facility, Harbison was the manager of Marlyn's manufacturing department.  (Tr. 1049, 1092) As manager of Marlyn's manufacturing department, Harbison was responsible for "keeping track of material availability, batches that were able to be run [and] work[ing] on the machines as needed."  (Tr. 1049)

18.  In November 2001, Marlyn purchased two Zanazi 70 F capsule filler machines from IMA at a discount of 0.5% to 1%.  In November 2001, Marlyn purchased two Zanazi 40 F capsule filler machines from IMA at a discount of 1.5% to 2%.  In June 2001, Marlyn purchased three Kilian S-250 tablet presses from IMA for full price with no discount. (Tr. 57, 58, 60)

**B.  The Comprima Tablet Press**

19.  A Comprima tablet press consists of two towers - the main tower which contains the press, and a control tower which contains the computer to control production.  The main tower is approximately six feet tall, three feet wide, and four feet deep, and weighs approximately 4000 kilograms, a little over 4 tons.  The control tower is approximately five feet

tall, two feet wide, and two feet deep, and weighs about 300 kilograms, roughly 661 pounds. (Tr. 258, 260, 444, 445)

20. A Clean in Place ("CIP") unit is optional equipment for the Comprima tablet press. (Tr. 444, 445, 265)

21. IMA Italy manufactures two "families" of the Comprima tablet press, one family consists of the Comprima 180/230, and the other family consists of the Comprima 250/300 models. (Tr. 440) The tablet presses within a family are identical, with the exception of the turret. The turrets are interchangeable within a family and have a specified number of stations that determine the number of tablets the machine can produce. The Comprima 180 and 230 are identical, except that the turret on the Comprima 180 has 20 stations, and is capable of producing 180,000 tablets per hour. The turret on the Comprima 230 has 26 stations, and is capable of producing 230,000 tablets per hour. (Tr. 262, 264, 267, 440, 441;docket # 102 at 7)

22. It generally takes IMA Italy nine to twelve months to manufacture a Comprima tablet press. (Tr. 447) Because customers do not want to wait that long for a machine, IMA Italy begins the manufacturing process and proceeds to a point where it will take three to four months to complete a tablet press. (Tr. 447, 448) IMA Italy warehouses the partially-built machines until a customer places a purchase order. A partially-built machine may remain in IMA Italy's inventory for months or years. (Tr. 450) Upon receipt of a purchase order, IMA Italy completes the manufacturing process in accordance with the customer's specifications.

23. When the manufacturing process is complete, IMA Italy affixes a plate to the machine identifying the machine's manufacture date. The manufacture date is the date on which the machine was completed for a customer, not the date on which IMA Italy began manufacturing the partially-built machine. The manufacture date (completion date) is the date from which the warranty applies, and date from which IMA Italy's ten-year obligation to support the machine (including providing spare parts) begins to run. (Tr. 448, 449)

24. The partially-built machines housed in IMA Italy's inventory cannot produce any tablets because such machines do not have either the powder feeding system or the

tooling which are designed for a specific customer, and are not manufactured or installed until the tablet press is sold.  (Tr. 449, 450)

25.  IMA Italy does not manufacture every component or part that it incorporates into a Comprima press.  (Tr. 454)  Rather, IMA Italy purchases many components from commercial vendors (such as bulbs, switches, sensors, and motors), or from outside suppliers who manufacture mechanical parts based on IMA Italy's design.  (Tr. 454, 455)  IMA Italy purchases components in bulk and stores them in inventory until needed for manufacturing a particular machine.  (Tr. 454, 455)

26.  In view of the foregoing process, a machine that is completed in a particular year will likely contain parts that were manufactured in previous years (dated parts).  (Tr. 456, 286, 382, 383)

27.  The date that a particular part was manufactured does not effect IMA Italy's standard one-year warranty or reduce IMA Italy's obligation to support the machine for ten years, both dates begin to run from the date on the manufacture plate (the date of completion).  (Tr. 456, 448, 449)

28.  A customer can purchase an extended warranty calculated at 4% of the base price of the unit for each additional year after the 12-month warranty expires.  (Tr. 456, 457)

**C.  Sale/Purchase of the Comprima 230 Tablet Press**

29.   In September 2003, Marlyn (through Lehmann and Gulick) contacted IMA (through Benney) regarding a Comprima 180 tablet press for production of Marlyn's SAMe tablets.  (docket # 102 at 6, Tr. 458, 648, 745)

30.  Marlyn requested a quote on a Comprima 180 in September 2003 and IMA provided a quote for a Comprima 180, totaling approximately $600,000, excluding services and other options.  (Tr. 459-462)

31.  At that time, Marlyn was manufacturing SAMe tablets using a Kilian S-250 tablet press that it had purchased from IMA in 2001.  (Tr. 648, 649, 663, 910, 458)

32.  A Kilian S-250 press mechanically pushes the powder from a feeder into

the press.  (Tr. 250)  Kilian S-250 presses are designed to run 24 hours a day, seven days a week, and can produce up to 525,000 of the 200 milligram SAMe tablets per batch.  (Tr. 651, 652, 1095)  It takes Marlyn roughly eight hours[5] to make a batch (525,000) of 200 milligram SAMe tablets on a Kilian S-250, which equals 65,625 tablets per hour, 1,575,000 tablets per day, and 11,025,000 tablets per week.  (Tr. 1068, 1069, 651, 652)

33.  In October 2003, Ferrini visited Marlyn's facility and met with Gulick and Benney.  The purpose of the meeting was to follow-up on the September 2003 quote for the Comprima 180 ($600,000), and to discuss a test of SAMe powder, which is extremely fine, on a Comprima 300 tablet press that IMA Italy had set up as a demonstrator in Bologna, Italy.  (Tr. 316-17, 463, 468, 663; docket # 102 at 6)

34.  In mid-December 2003, Gulick and a representative of Gnosis  went to IMA Italy's factory in Bologna, Italy to observe a test run of SAMe powder on the Comprima 300.  Gulick and Marlyn's customer, Gnosis, were satisfied with the test.  (Tr. 467, 468, 469, 673, 675-676; docket # 102 at 6)

35.  During the December 2003 visit, Ferrini took Gulick on a tour of IMA Italy's factory.  At that time, IMA Italy was manufacturing a Comprima machine.  (Tr. 471, 473, 678; docket # 102 at 6)

36.  Marlyn later requested that IMA Italy perform another test run with the SAMe powder, using the actual shape of the SAMe tablet that Marlyn was producing.  Ferrini told Gulick that IMA Italy would perform a second test if Marlyn paid for the design and manufacture of the specific tooling equipment necessary for the test.  IMA Italy later issued a $3,432.40 quote for the tooling equipment which Marlyn rejected.  (Tr. 469, 471, 475, 477)

37.  Sometime in January 2004, Marlyn (through Gulick) requested a quote from IMA (Benney) on a Comprima 230.  (Tr. 681, 682, 481, 482)  Marlyn informed IMA that it wanted to have a Comprima 230 press by the summer of 2004 to meet the increased demand

---

[5] It takes a total of 16 hours to make a completed batch of 200 milligram SAMe tablets using the Kilian S-250 press. Eight hours of time is on the Kilian S-250 press, and an additional eight hours is required on a different machine that coats the tablets. (Tr. 652, 1068, 1069)

for the SAMe product.  (docket # 102 at 7; Tr. 676-77)

38.   On January 21, 2004, IMA sent Marlyn quote number 1100050737 (Exhibit 5, "Quote I"), offering to sell a Comprima 230 to Marlyn.  The base price was $419,224 and the total price, including options, a standard 12-month warranty, installation, and training, was approximately $900,760.00.  (docket # 102 at 7; Exhibits 4 and 5, Tr. 72, 81-84, 483-84, 579, 682, 683, 917)

39.   Exhibit 5 contains Quote I for a Comprima 230 that IMA Italy had available in its inventory that could be completed in three months, with all available components and options, but excluding delivery.  (Exhibit 5, Tr. 73, 81, 483, 484, 579)

40.   Lehmann considered Quote I "very high" and rejected it.  (Tr. 917)

41.   Thereafter, in January, 2004, Lehmann received a quote for an "unused" Comprima 300 (the "Genzyme Comprima 300") for $450,000 from Federal Equipment ("Federal").  (Tr. 784, Tr. 684, 685; Exhibits 6, 9)

42.   On January 23, 2004, Lehmann signed a Sales Order to purchase for $450,000 an "unused", second-hand Comprima 300 from Federal that had previously been sold to Genzyme in Ireland.  (Tr. 784, Exhibits 6, 9; Tr. 684, 685, 767, 769, 797, 994)

43.   Gulick testified that: (1) he saw pictures of the Genzyme Comprima 300, and discussed that machine with Lehmann in January 2004 before Lehmann signed the Federal sales order; (2) he knew IMA Italy had sold the machine to Genzyme in Ireland in 2000; and (3) he knew in January of 2004 that, because it takes at least a year to build a Comprima 300, it was likely that the Genzyme 300 contained parts that were dated 1998 or 1999.  (Tr. 766-769)

44. Although Gulick knew that the Genzyme Comprima 300 was manufactured in 2000 and contained parts that were dated 1998 and 1999, Gulick referred to it as a "brand new" machine, believed it was a "brand new" machine, and testified that the age of the components in the machine did not affect whether the machine was brand new.  (Tr.  770)

45.   Lehmann also referred to the Genzyme Comprima  300 as a "new" machine (Tr. 994), even though he (1) knew that the machine had been sold to Genzyme in Ireland in 2000 or 2001; and (2) in 2004, he would have expected the Genzyme Comprima 300

to contain parts that were at least four years old, because he knew it took IMA Italy at least a year to build a Comprima 300.  (Tr. 995- 999)

46.  The Genzyme Comprima 300 was not under warranty.  Gulick asked Benney whether IMA would warrant or service the Genzyme Comprima  300.  In February 2004, Benney told Gulick that IMA would not warrant or service the Genzyme Comprima 300. (docket # 102 at 7, Tr. 686) As a result, Marlyn decided not to purchase the Genzyme Comprima 300.  (docket # 102 at 7)

47.  After learning that Marlyn desired a "very bottom" price and that it was considering purchasing the second-hand Genzyme Comprima 300, IMA suggested that Marlyn consider purchasing a Comprima 230 which (a) was partially built in 2000, (b) was displayed once in 2000 at a trade show in Germany, (c) was in IMA Italy's warehouse awaiting completion, (d) was 60%-70% completed in terms of man hours, and could be completed within three months, (e) IMA would fully warrant, and (f) IMA could offer at a substantial (22%) discounted price.  (Tr. 488-89, 492, 508-511)

48.  Gulick described the difference between a machine that has been "displayed" and a machine that has been "demonstrated" as follow: "A display model is something that's taken to shows and shown to people to potentially purchase the product."  (Tr. 801) A display model has never been used to make a product.  (Tr. 801) On the other hand, a machine that's been demonstrated at a trade show has "been demoed (sic) and they're demonstrating the machine . . . how the product runs."  (Tr. 802)

49.  On February 19, 2004, IMA delivered Marlyn quote number 110005103, (Exhibit 15, "Quote II") for a Comprima 230 tablet press (the "Machine"), which is at issue in this case.  (docket # 102 at 7, Exhibit 15; Tr. 63, 489)  The Quote does not describe the Comprima 230 as new, unused, displayed or otherwise.

50. The Comprima 230 at issue that was offered in Quote II, Exhibit 15, is a physically different machine than the Comprima 230 that was offered in Quote I, Exhibit 5. (Tr. 489, 213; Exhibits 1, 15)

51.  Quote II included a price of $585,000, which reflected a substantial

discount from IMA Italy's standard list price on the Comprima 230, and included all of the options[6] selected by Marlyn.  (Exhibit 15; Tr. 53)  Additionally, IMA: (1) included several extras valued over $60,000, including, (a) an extended warranty (from 12 to 18 months) valued at $6,539.89, (b) one week of additional training, valued at $11,435, (c) shipping and delivery from Italy to Phoenix, Arizona, valued in excess of $10,000, and (d) a $25,000 spare-parts credit[7]; and (2) IMA was to receive, in trade, a Kilian S-250 tablet press from Marlyn, which was valued at approximately $60,000.  (Tr. 95-99, 102, 236, 238; Exhibits 5, 15, 56A)

52.  The 22% price discount was out of the ordinary for IMA and Marlyn and was higher than any other discount given to Marlyn in all other dealings between IMA and Marlyn, and was much higher than typical discounts.  (Tr. 57, 60)  The 22% discount was so unusual, that IMA's CFO, Krouchick, was involved in the transaction.  (Tr. 50, 53, 54, 508, 509)

53.  The normal discount that IMA gives on a Comprima machine is 4 to 6 percent.  (Tr. 50)

54.  Although Marlyn admitted that the Machine was discounted at least 6 % and Gulick acknowledged that Marlyn actually received a 22 % discount on the Machine at issue, Gulick testified that he believed the substantial discount was given simply to get the deal done, and was not related to the fact that the Machine had been a display machine.  (Tr. 692)

55.  Gulick's testimony on this topic is inconsistent with Lehmann's.  For example:

a.  On direct examination, Gulick testified that Benney met with him and Lehmann during an alleged meeting in February 2004, at which time Benney told Gulick and

---

[6]  Quote II included a price for a fan, item number 01003, for $10,951.20.  (Exhibit 15 at 15) IMA admits that it did not deliver the fan and has reduced the amount of damages requested by the price of the fan.  (Tr. 241-42, 508)

[7]IMA has not yet provided the spare parts credit because Marlyn has not paid the balance owed for the Comprima 230.  IMA has stated that it will provide the full spare parts credit once Marlyn pays its full debt. (Tr. 238-239)

1   Lehmann that IMA would not service the Genzyme Comprima 300.[8]  (Tr. 685, 25)

2          b.  On cross-examination, however, Gulick testified that Benney had sent him

3   an e-mail before January 21, 2004, stating that IMA would not service the Genzyme Comprima

4   300.  Gulick acknowledged that Marlyn had not produced a copy of this e-mail to IMA and

5   could not do so, because in December 2006 (nearly a year after this lawsuit was filed in January

6   2006 but before Marlyn filed a counterclaim in March of 2006), he purged all of his e-mails on

7   his computer.  (Tr. 777, 746, 747)

8          c.  Gulick later testified that the meeting he had with Lehmann and Benney was

9   on February 6, 2004, at which time Benney, Gulick and Lehmann allegedly discussed the

10  Machine at issue in this case.  Again, Gulick's testimony was inconsistent with his prior

11  testimony on direct examination, and inconsistent with his testimony on cross-examination, and

12  at his August 17, 2007 deposition.

13         d.  For example, during direct examination, Gulick testified that there was *no*

14  discussion about $585,000 or any price at the alleged February 2004 meeting.  (Tr. 688)

15  Whereas later on during direct examination, Gulick gave inconsistent testimony, stating that the

16  $585,000 price *was* discussed at the alleged February 6, 2004 meeting.  (Tr. 691)

17         e.  Gulick testified that he took notes at the alleged February 6, 2004 meeting,

18  but that he did not and could not produce those notes (or any other notes) because he discarded

19  his notes and notebooks.[9]

20

21     [8]  Lehmann denied having attended any supposed February 2004 meetings with Gulick

22  and Benney. Lehmann testified that he did not meet Benney until some time in July 2004, after
    the Comprima 230 at issue was delivered to Marlyn's facility.  (Tr. 915, 925, 932, 1029)

23

24     [9]  Benney testified as follows: "Q.  So, sir, you have purged all of the e-mails on your
    computer that were on your computer throughout the entire relevant period from September

25  2003 to December of 2004; correct?

26  A.  Correct.

27  Q.  And you took notes of telephone conversations you had with Mr. Benney,

28  didn't you sir?

1 _____

2

3      A.  Correct.

4      Q.  But you did not keep those notes, did you?

5      A.  No.

6

7      Q.  In fact, you kept a notebook of conversations that you had with Mr. Benney, didn't you sir?

8

9      A.  Yes.

10     Q.  You did not keep that notebook, did you sir?

11     A.  No.

12     Q.  That notebook has never been provided to the plaintiff in this case, has it?

13

14     A.  No.

15     Q.  You took notes of the meetings that you described today in your notebook, the meetings that you supposedly had with Mr. Benney and Mr. Crozier, didn't

16     you sir?

17     A.  No.

18

19     Q.  Your testimony under oath today is you did not take any notes during those meetings, sir?

20

21     A.  I thought you said 'notebook.'

22     Q.  Did you take notes during the meetings that you claim to have had with Mr.

23     Benney and Mr. Crozier in July of 2004?

24     A.  Yes.

25

26     Q.  You threw those notes away, didn't you sir?

27     A.  Yes.

28     Q.  Sir, isn't it true that you've thrown away all of the notes of all of the

f.  On direct examination, Gulick testified that he prepared Marlyn's Exhibit 105, a comparison worksheet (the "Worksheet") of the price of the Genzyme 300 and the Comprima 230 in Quote I, immediately after the supposed February 6, 2004 meeting with Benney and Lehmann.  (Tr. 701, Exhibit 105)  Gulick testified that he obtained the specific information used in the Worksheet from Benney during that meeting.  (Tr. 703, 704)  Later, on during cross-examination, Gulick admitted that at his deposition, he testified that he did not remember when he prepared the Worksheet, Exhibit 105, other than sometime during January or February 2004, and testified that he did not know when or from whom he obtained the information contained in the Worksheet, Exhibit 105.  (Tr. 787, 807, 812)

56.  The Worksheet, Exhibit 105, does not include the date on which it was prepared, or the source of the information contained therein.  It does not refer to either Quote I or Quote II, and does not indicate whether the Comprima 230 listed on the Worksheet was a display machine.

57.  On or about April 30, 2004, IMA received a purchase order, dated February 19, 2004, from Marlyn (the "Purchase Order") for the Machine at issue in this case. (Tr. 101, 63; Exhibit 20)

58.  The Purchase Order (Exhibit 20) was made subject to the terms of Quote II, Exhibit 15, and required Marlyn to pay a percentage of the purchase price as a down payment with the balance of the $585,000 due "upon arrival of the equipment at Marlyn's warehouse." (Exhibit 20, Tr. 63)

59.  On or about May 27, 2004, the parties agreed that Marlyn would make a down payment of 40% of the $585,000 ($234,000), which Marlyn paid.  (docket # 102 at 8; Exhibit 21; Tr. 63-64)

60.  Pursuant to Quote II, Exhibit 15, (i) "[t]he delivery date is . . . the date of

_____

meetings that you had with the representatives from IMA North America?

A.  I would say yes."  (Tr. 749, 570)

- 14 -

1   departure of the goods from" IMA Italy's factory in Bologna, Italy; (ii) delivery is due "3

2   months after receipt of the order as well as any samples and finali[z]ation of all technical and

3   commercial details, [and] shall depend on the number of orders currently being processed"; and

4   (iii) [if circumstances arise that] require the original delivery date to be changed, the Seller

5   reserves the right to set a new delivery date . . . ."  (Exhibit 15 at 19; Tr. 85, 86, 232, 234;

6   docket # 102 at 9)

7            61.  Marlyn never sent SAMe powder that IMA Italy needed for a final test of

8   the Machine. (Tr. 506-07)  The Machine departed IMA Italy's factory, or was "delivered", no

9   later than the middle of June 2004. (Tr. 146; docket # 102 at 8)  IMA had received the Purchase

10  Order on April 30, 2004, which is less than 3 months from the June 2004 delivery date.  Thus,

11  the Machine was timely delivered in compliance with Quote II and the Purchase Order. (Exh.

12  15 at 19, Exh. 20; Tr. 101, 63)

13           62.  The Machine arrived at Marlyn's facility on July 15, 2004.  (Tr. 146, 64)

14           63.  Although Marlyn was required to pay the balance of the $585,000 purchase

15  price "upon arrival of the equipment at Marlyn's warehouse," Marlyn did not pay, and has

16  refused to pay, the balance owed based on its allegation that the Machine was "used" or not

17  new.  (docket # 102 at 8)

18           64.  As of the October 14, 2008 trial date, excluding costs and attorneys' fees,

19  the amount owed to IMA by Marlyn for the machine itself was $484,639.41, reflecting

20  $340,048.80 in principal, and $144,590.61 in accrued interest (the "Comprima Debt"). (Exhibit

21  57A; Tr. 246, 247)  Interest is accruing at a rate of 10% per annum, which equals $93.16 per

22  day. (*Id.*)

23           65.  In addition to Marlyn's purchase of the Comprima 230, from February of

24  2004 to May of 2005, Marlyn submitted several purchase orders to IMA (the "Additional

25  Purchase Orders), pursuant to which Marlyn agreed to: (i) purchase the Additional Items from

26  IMA; and (ii) pay for the Additional Items net 30 days.  (docket # 102 at 9; Exhibits 36-49 and

27  57A; Tr. 123)

28           66.  Although IMA shipped the Additional Items to Marlyn, Marlyn has failed

1   to pay the amounts due for the Additional Items.  (docket # 102 at 9)

2          67. The total that Marlyn owes IMA for the Additional Items as of the October

3   14, 2008 trial date was (i) $334.91 reflecting $108.50 in principal, and $226.41 in accrued

4   interest (the "Additional Debt").  Interest is accruing on the Additional Debt at a rate of 10%

5   per annum, which equals $0.0297 per day.  (Exhibits 36-49 and 57A, Tr. 123)

6          68.  In June 2005, IMA's counsel sent a demand letter to Marlyn, advising

7   Marlyn that IMA would file a lawsuit to collect the debt if  Marlyn did not pay.  Marlyn did not

8   pay IMA and continues using the Machine at issue.  (Tr. 94, 95; document # 102 at 8-9, 34-39)

9   **D.  Acceptance of Machine/Machine's Condition**

10         69. Gulick testified that before the Machine was delivered to Marlyn's facility,

11  he believed it was a used machine.  (Tr. 750, 751)   He also testified that he conveyed this

12  information to Lehmann before the Machine was delivered. (Tr. 751)  Lehmann denies this

13  statement.  (Tr. 954)

14         70.  Notwithstanding Gulick's belief that the Machine was used, Marlyn

15  accepted delivery of the Machine, had IMA's employees install the Machine, had IMA's

16  employees train Marlyn's operators on the Machine's use and maintenance, had IMA's

17  employees perform warranty work on the Machine, and has continued to use the Machine for

18  over four years producing more than 225,000,000 tablets on the Machine for profit.  (Tr. 750-

19  752, 816, 817, 824, 825, 971, 973, 974, 975, 1006, 1007, 1009)

20         71.  The Machine was not used before it was delivered to, and received by,

21  Marlyn. (Tr. 489-494, 497, 453)  Rather, the Machine was partially built in 2000 and was

22  displayed once at a trade show in Germany in 2000.  (Tr. 450, 451, 489-94)  At the time of the

23  trade show, the Machine was only 60-70% built, was not equipped with tooling or powder

24  feeding system, and was not capable of producing any products. (Tr. 453, 491-94, 497)  The

25  Machine was turned on at the trade show, but was not demonstrated or otherwise used.  (Tr.

26  490-91)  After the trade show, the Machine was returned to IMA Italy's warehouse and stored

27  until the manufacturing process was completed to Marlyn's specifications in 2004.  (Tr. 490,

28  491, 501, 502, 582)  When IMA Italy tested the Machine before shipment to Marlyn, it used

a neutral powder, a placebo, because it had not received the SAMe powder from Marlyn.  (Tr. 506-07)

72.   Upon arrival of the Machine at its facility, Marlyn uncrated the Machine and inspected it prior to installation.  (Tr. 817-818)

73.   During the inspection, Marlyn found (i) several parts that were dated 1998 or 1999 ("dated parts"), (ii) rust on the drive shaft, (iii) powder in the lower cabinet of the main tower, (iv)  scratches and scrapes under the panels of the main tower, (v) a small tear in the insulation covering a pipe on the CIP unit, and (vi) a label indicating that the machine had been manufactured in 2004, even though it contained parts dated 1998 or 1999.  (Tr. 364, 375-376, 378, 382, 395, 396, 406, 408, 708)

74.   After the inspection, Gulick called Benney and asked why IMA had sold Marlyn a used machine.  Benney denied that the Machine was used.  (Tr. 725-726)

75.   Before the Machine was installed, on July 20, 2004, Benney and Crozier (Benney's supervisor) met with Lehmann and Gulick at Marlyn's facility.  During that meeting, Lehmann mentioned that IMA's technicians had found some rust on the drive shaft and had cleaned it off.  Lehmann also expressed concern about the age of the some of the electrical components and told  Crozier that IMA should replace the dated electrical components with parts that were manufactured within two years of the date the Machine was delivered.  (Tr. 1119, 1121)  Lehmann also expressed concern that the Machine's computer might be obsolete, and asked Crozier if the Machine had been used before it was sold to Marlyn. (Tr. 1119, 1121; Exhibit 30)

76.   During the July 20, 2004 meeting, Crozier told Lehmann that he believed the computer was suitable, that the Machine had the newest version of the computer software, and the computer was covered by the warranty.  (Tr. 1121) Crozier also told Lehmann that the electrical components were adequate, but that he would convey Lehmann's concerns to IMA Italy, and to make Marlyn happy, the electrical components would be replaced with parts manufactured between 2002 - 2004, once approved by IMA Italy.  (Tr. 1121)

77.   In response to Lehmann's concern that the Machine was used, Crozier told

1   Lehmann that the Machine had been displayed during a trade show in Germany in 2000, and

2   was then returned to IMA Italy's warehouse.  Lehmann responded that he was not aware that

3   the Machine had been displayed.  Crozier told Lehmann that, during the negotiations for the

4   Machine, Benney and Gulick had discussed the fact the Machine had been displayed at a trade

5   show. Gulick did not deny Crozier's statement regarding those negotiations.  (Tr. 1121, 1126)

6           78.  On direct examination, Lehmann admitted that during the July 20, 2004

7   meeting, Benney twice told Lehmann that the Machine had been displayed before it was sold

8   to Marlyn.  (Tr. 935, 936)

9           79.  During the July 20, 2004 meeting, no pictures of the Machine upon its

10  arrival at Marlyn's facility were shown to IMA's representatives.  (Tr. 934-35)  Marlyn did not

11  mention that powder was found on the Machine (Tr. 934), Marlyn did not mention a tear in the

12  insulation on the CIP unit, or mention any scratches on the Machine's frame.  (Tr. 934-35, 1126,

13  1127)

14          80.  During the July 20, 2004 meeting, which occurred before the Machine was

15  installed and before Marlyn's S-250 trade-in was crated, no one from Marlyn demanded that

16  IMA take back the Machine and return Marlyn's down payment. Crozier testified that at that

17  point, if Marlyn had demanded that IMA take back the Machine, IMA would have done so and

18  returned Marlyn's deposit  because the Machine was still new. Likewise, IMA would not have

19  installed the Machine, trained Marlyn's operators how to use the Machine, or permitted Marlyn

20  to use the Machine if  Marlyn had demanded that IMA take back the Machine at the July 20,

21  2004 meeting.  (Tr. 1030, 1032; 1127-29, Exh. 26)

22          81.  Although Lehmann testified on direct examination that during the July 20,

23  2004 meeting and other meetings he "demanded' that IMA take back the Machine, he later

24  testified that he simply "ask[ed Crozier] to consider taking the machine back."  (Tr. 940, 941)

25   On cross-examination, Lehmann stated that although he took notes during his meetings with

26  Crozier, he had thrown them away and could not produce any evidence of a "written demand"

27  that IMA take back the Machine.  Lehmann also admitted during his deposition, he was not

28  certain whether he had ever demanded return of Marlyn's money in exchange for the Comprima

1  230 (Tr. 1030-32); that he "could not demand," "cannot make demands," and that he "may have

2  told [IMA] that [Marlyn] would like to have a new machine or take it back and give us back the

3  money, yeah."  (Tr. 1030-1032)

4          82.  After the July 2004 meeting, Crozier obtained IMA Italy's approval to

5  replace the "dated" electrical components about which Lehmann had complained.  On July 21,

6  2004, before the Machine's installation was complete, Crozier and Benney met with Lehmann

7  and Gulick again and told Marlyn that the electrical components would be replaced.  Marlyn

8  did not mention the rust or the computer issues again and IMA considered those matters

9  resolved.  Marlyn did not mention powder on the Machine, a tear in the CIP's insulation,

10  scratches on the Machine's frame, or offer any photographs of the Machine.  (Tr. 1120-1124)

11         83.  Crozier testified that during the July 21, 2004 meeting, no one from Marlyn

12  demanded that IMA take back the Machine but IMA would have taken back the Machine and

13  returned Marlyn's money at that point. (Tr. 1129-1134) Crozier testified that at the conclusion

14  of the July 21, 2004 meeting, he thought all the issues with the Machine were resolved and

15  expected final payment after the outstanding electrical components were delivered and installed.

16  (Tr. 1129, 1134)

17         84.  After the July 21, 2004 meeting, Crozier initiated replacement of the dated

18  electrical  components, the parts were delivered to Marlyn, and IMA's technician (Reyes) was

19  at Marlyn's facility on October 8, 2004 to install the parts.  Lehmann refused to permit IMA to

20  install the parts because he no longer trusted IMA.  (Tr. 1134, 287, 289; document # 102 at 8;

21  Tr. 993, 994; Exh. 30)  Reyes left the replacement parts with Marlyn.  (Exh. 30)

22         85.  Although Marlyn believed the Machine was "used," and notwithstanding

23  the (i) dated parts, (ii) rust on the drive shaft, (iii) alleged powder on the Machine, (iv) scratches

24  on the frame, and (v) tear in the CIP insulation, Marlyn had IMA install the Machine, train

25  Marlyn's operators on the Machine's use and maintenance, required IMA to perform warranty

26  work on the Machine, and has been using the Machine for over four years to produce over 225

27  million SAMe tablets at a profit.  (Tr. 751, 905, 964, 971, 975, 1006, 1009; Exhibits 26, 35, 50-

28  52; docket # 102 at 8-9)

1   86.   IMA's technician, Torres, spent more than 120 hours over the course of

2 two weeks, between July 19 and August 2, 2004, installing the Machine, and training Marlyn's

3 operators on the use and maintenance of the Machine.  (Tr. 335, 346-348, 355 361, 363; Exhibit

4 26)  During this process, Torres modified the Machine at Marlyn's request by rerouting the

5 tablet chute which required making a "3.0 inch . . . hole in the upper section of the ERWECA

6 system chamber [the cover of the Machine's cabinet]."  (Tr. 335, 340-348, 361-363; Exh. 26)

7   87.   The Machine contained several electrical components dated 1998 or 1999

8 because the manufacturing process began in 2000.  Although the manufacturing process began

9 in 2000, the Machine was not equipped with any tooling or powder feeding until IMA Italy

10 completed manufacturing the Machine for Marlyn in 2004.  (Tr. 506)  As a result, the Machine

11 contains a label, indicating that it was manufactured in 2004.  (Tr. 450, 451, 507)

12   88.   The Machine's electrical components, dated 1998 or 1999, were new when

13 they were installed.  (Tr. 503, 504)   IMA did not make any changes to the electrical

14 components that were used to build the Comprima 230 model between the year 2000 when IMA

15 Italy began manufacturing the Machine at issue and June 2004 when IMA Italy completed

16 construction of the Machine for Marlyn.  Tr. 453, 511)  IMA offered to replace the dated

17 electrical components with more current electrical components.  (Tr. 287-288, 512)   IMA

18 delivered replacement parts to Marlyn's facility in Phoenix and IMA's technician was ready to

19 install those parts.  Marlyn refused to permit IMA to install the replacement parts. (Tr. 288-289,

20 512; Exh. 30)

21   89.   Marlyn admitted that the age of the Machine's components has no effect

22 on whether the Machine was new.  (Tr. 770)

23   90.   The Machine was equipped with the latest software package that IMA Italy

24 had available for its machines.  (Tr. 512)

25   91.   IMA Italy did not change the design of the Comprima 230 between the

26 year 2000, when it began manufacturing the Machine at issue, and June 2004 when it completed

27 the Machine at issue for Marlyn.  (Tr. 453)

28   92.   The rust on the Machine's drive shaft did not damage it or cause other

1  problems with the Machine's operation.  (Tr. 375, 380, 414, 510)

2          93.  Marlyn states that it found powder on the Machine upon its delivery, but

3  Marlyn did not inform IMA about the powder in July 2004 before the Machine was installed.

4  (Tr. 380; Exh. 26)

5          94.  Marlyn states that the frame of the Machine was scratched upon its arrival

6  at Marlyn's facility in July 2004.  Marlyn did not mention the scratches or ask IMA to repair

7  the scratches before the Machine was installed in July 2004. The scratches did not impair the

8  Machine's operation.  (Tr. 416, 418, 419)  The scratches could have been made by the metal

9  brackets used to secure the Machine in the crate during transit from Italy to Phoenix and did not

10  necessarily mean that the Machine was used.  (Tr. 416-420)

11          95.  There was a tear in the insulation on the Machine's CIP unit, but Marlyn

12  did not mention the tear during the July 20 and 21, 2004 meetings.  A small tear in the insulation

13  was not unusual and did not impair the Machine's operation.  IMA's employee, Torres, offered

14  to repair the insulation. Marlyn, however, indicated that it would resolve the problem with

15  aluminum tape.  (Tr. 421-425)

16          96.  The Machine was fully operational when IMA's technicians completed the

17  installation.   (Tr. 350, 358; Exh. 26)

18          97.  IMA trained Marlyn's operators on the use and maintenance of the

19  Machine. (Tr. 26)  Before this lawsuit was filed on January 26, 2006, Marlyn did not request

20  additional training or complain about the adequacy of the training it received.  (Tr. 301, 358;

21  docket # 1)

22          98.  Marlyn began using the Machine after it was installed and experienced

23  several issues that required servicing.  IMA fixed those issues in accordance with the warranty.

24  (Tr. 274, 299, 312, 302-303)  A "Technical Assistance Service Form," dated October 5, 2004,

25  indicates that the "machine was full of powder."  (Exhibit 30)  The form explains that powder

26  was overflowing from the main tank into the turret and was running into the mechanical area.

27  (Exhibit 30)  IMA's technician, Reyes, indicated that a part would be sent from IMA Italy to

28  correct the problem.  (Exhibit 30)  In December of 2007, IMA  performed further service on the

Machine.  (Exhibit 35)

99.  Crozier next met with Lehmann and Gulick on November 9, 2004 to introduce Mr. Graff, Benney's replacement, and to discuss payment of the balance owed on the Machine. Lehmann only attended the meeting for "30 seconds." Gulick told Crozier that he would have to discuss final payment with Lehmann. During the meeting, Marlyn did not demand that IMA take back the Machine and refund Marlyn's money. Crozier testified that if such a demand had been made, IMA would not have taken the machine back at that point because Marlyn had used it and it was now a used machine.  (Tr. 1135, 1136-38)

100.  Crozier next met with Lehmann in late April or early May 2005. That meeting was attended by Crozier, Graff, Ferrini, Lehmann, and Gulick.  During the meeting the parties discussed final payment for the Machine. Lehmann stated that he would not pay the balance and that IMA could take back the Machine unless it gave Marlyn an additional discount. This meeting was the first time Marlyn raised the issue of IMA taking the Machine back. Crozier told Lehmann that Marlyn had already received a substantial discount, but he would discuss an additional discount with management.  Crozier told Lehmann he could not take the Machine back because IMA had spent a "great deal of time and money" installing the Machine and training Marlyn's employees, and the Machine was now used.  (Tr. 1137, 1138)

101. Crozier's last meeting with Lehmann was on June 5, 2005. At that meeting, Crozier told Lehmann that IMA would not offer an additional discount, and demanded final payment.  Lehmann refused to make the payment and had Crozier escorted to the parking lot. (Tr. 1138, 1139)

102.  IMA paid IMA Italy $535,000 for the Machine.  (Tr. 66)  IMA also paid shipping costs and insurance for the Comprima 230, which was insured at a value of $552,000 (which covered the Machine alone). (Tr. 67-69)

## IV.  Conclusions of Law

### A. Formation of a Contract/Contract's Terms

1. Article Two of the U.C.C. applies to transactions in goods. A.R.S. § 47-2102. Goods are defined as "all things (including specially manufactured goods) which are movable

at the time of identification to the contract. . . . ." A.R.S. § 47-2105(A). A "buyer" is a person who buys or contracts to buy goods and a "seller" is a person who sells or contracts to sell goods. A.R.S. § 47-2103.

2. The contract under consideration, a contract for the sale of a Comprima 230 tablet press, is a sale-of-goods contract governed by Article Two of the U.C.C. A.R.S. § 47-2102.

3. "In Arizona, . . . the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understanding, subsequent conduct and the like . . . may be used to interpret the meaning of the provisions contained in the agreement." *Darner Motor Sales v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 393, 682 P.2d 388, 398 (Ariz. 1984). "[T]he judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the [extrinsic] evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (Ariz. 1993).

4. Course of dealing is one form of admissible extrinsic evidence. A.R.S. § 47-1303(B). "[A]n offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties." Restatement (Second) of Contracts § 33, comment a. Restatement § 223 defines course of dealing as follows:

> (1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

Restatement § 223, comment b explains that course of dealing "may become part of an agreement . . . by tacit recognition, or it may guide the court in supplying an omitted term . . . [I]t may determine the meaning of language or it may annex an agreed but unstated term." *Id*.

1     5. Prior to the purchase at issue, Marlyn had purchased several machines from
2     IMA, including three Kilian S-250 tablet presses and Zanazi encapsulation machines.  All of
3     those machines were new and were sold with either no discount (the Kilian S-250 tablet
4     presses), or at a discount of no more than 2 %.

5     6. Marlyn admits that the Machine at issue in this case was discounted at least
6     6 %. (Tr. 703, 887; docket # 158 at 9)  And Gulick, Marlyn's director of Contract
7     Manufacturing who was responsible for the SAMe product during the relevant time,
8     acknowledged that Marlyn received a 22% price discount. (Tr. 692)  A discount of, at least, 6%
9     and up to 22 % takes this contract outside the parties' ordinary course of dealings.

10    7. There is no question that IMA and Marlyn entered into a binding contract.
11    IMA's February 19, 2004 Quote, (Quote II, Exhibit 15), was an offer, and Marlyn's April 30,
12    2004 Purchase Order (Exhibit 20) was an acceptance of that offer.  Based on the agreement and
13    the parties' negotiations, IMA agreed to sell and Marlyn agreed to buy, a Comprima  230 tablet
14    press with the options identified in Quote II, for $585,000.00 plus Marlyn's trade-in of a Kilian
15    S-250 tablet press (valued at $61,936), for total consideration of $646,936.00.  Marlyn agreed
16    to pay a 40% down payment, or $234,000, and to pay the remaining balance "upon arrival of
17    the equipment into [its] warehouse. . . ." (Exhibits 15, 20)   Although neither Quote II nor the
18    Purchase Order (dockets ##15, 20) describe the "Comprima 230 tablet press" as new, used, a
19    display model, the parties' negotiations and the resulting contract contemplated a Comprima
20    230 tablet press that had been displayed once at a trade show in 2000. *Darner Motor Sales*, 682
21    P.2d at 398;  *Taylor*, 854 P.2d at 1139 (citing 3 Corbin § 542, at 100-05 (1992 Supp.) (stating
22    that Arizona courts follow Professor Corbin's view that the court may consider all of the
23    proffered evidence to determine its relevance to the parties' intent and then applies the parol
24    evidence rule to exclude from the fact finder's consideration only the evidence that contradicts
25    or varies the meaning of the agreement.)

26    **B.  Performance under the Contract**

27    8. Under Arizona's U.C.C., a seller must "transfer and deliver." A.R.S. § 47-
28    2301.

1          9.   IMA delivered a Comprima 230 tablet press on our about June 5, 2004.

2    (Exhibit 15 defining delivery)  Marlyn received the Comprima 230 in its warehouse on July 15,

3    2004. A.R.S. § 47-2503 (stating that to tender delivery, a seller must "put and hold conforming

4    goods at the buyer's disposition and give the buyer any notification reasonably necessary to

5    enable him to take delivery."); A.R.S. § 47-2103(A)(3) (stating that the "'[r]eceipt' of goods

6    means taking physical possession of them."

7          10.  The Comprima 230 was timely delivered in accordance with the parties'

8    contract.  (Exhibits 15, 20); A.R.S. § 47-2503.

9          11.   After the Comprima 230 was delivered, Marlyn had "a right before

10   payment or acceptance to inspect [the Machine] at any reasonable place and time and in any

11   reasonable manner." A.R.S. § 47-2513(A).  Marlyn inspected the Comprima 230 and found rust

12   on the drive shaft, electrical components dated 1998 or 1999, scratches on the Machine's frame,

13   and powder in the lower mechanical area.

14         12.  Goods "conform to the contract when they are in accordance with the

15   obligations under the contract."  A.R.S. § 47-2106 (B).

16         13.  IMA delivered conforming goods to Marlyn, a Comprima 230 with the

17   options specified in Quote II.  Even if the parties' understood that the contract was for a new,

18   unused Comprima 230, the evidence establishes that IMA delivered a new, unused Comprima

19   230 to Marlyn.

20         14.  Pursuant to industry standards, as explained by the parties' testimony, a

21   machine that is displayed at a trade show is not used.  Marlyn has not established that the

22   Machine was non-conforming (not new) because it was displayed at a trade show in 2000.

23         15.  The fact that the Machine contained parts dated 1998 or 1998 does not

24   indicate that the Machine was not new, used or otherwise non-conforming.  It is undisputed that

25   IMA Italy manufactures tablet presses in stages.  Specifically, IMA Italy partially builds

26   machines with components it has in inventory, and maintains the partially built machines in its

27   warehouse for final completion upon purchase.  After IMA Italy receives a purchase order, it

28   completes the manufacturing in accordance with a particular customer's specifications.  Thus,

all of IMA Italy's tablet presses are "aged."

16.  The presence of rust on the Machine's drive shaft and scratches on the frame do not render the Machine used or otherwise non-conforming. Although, as Marlyn argues, rust and scratches are evidence of "age," age alone does not make the Machine used or not "new."

17.  That Marlyn needed to have the Machine serviced in October 2004, after it had already been installed, related to the feeding-tube issue does not establish that the Machine was not new or was otherwise non-conforming. IMA serviced the Machine and corrected the feeding-tube issue in accordance with the warranty.

### C.  Acceptance or Rejection of Goods

18.  If goods fail in any respect to satisfy the contract, the buyer may either accept or reject the goods.  A.R.S. § 47-2601.

19.  Under A.R.S. § 47-2606(A), acceptance of goods occurs when the buyer:

> 1. After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> 2. Fails to make an effective rejection (subsection A of § 47-2602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> 3. Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

A.R.S. § 47-2606(A); *Pace v. Sagebrush Sales Co.*, 114 Ariz. 271, 273, 560 P.2d 789, 791 (Ariz. 1977) (finding acceptance where buyers took possession of the goods, put them in its inventory, offered them for sale to the public, and sold a portion of the goods);

20.  Even if IMA delivered non-conforming goods, Marlyn accepted the goods by: (1) allowing IMA to install the Machine (and permitted IMA's technician to crate the Kilian S-250 [that was a trade-in pursuant to the contract] that it had been using to make SAMe tablets) and; (2) directing IMA's technician to modify the Machine during installation, which included cutting hole in part of the Machine; (3) allowing IMA to train Marlyn's operators on the use and maintenance of the Machine; (4)  requiring IMA to perform warranty work on the Machine -

including designing and manufacturing a new powder feeding array, and (5) continuing to use the Machine for more than four years to produce more than 225,000,000 SAMe tablets. Additionally, after the parties July 21, 2004 meeting, IMA reasonably believed that Marlyn would pay the balance due upon replacement of the dated electrical components. *McCormick v. Ornstein*, 119 Ariz. 352, 355, 580 P.2d 1206, 1209 (Ariz. Ct. App.1978) (concluding that buyer accepted the trailer when he offered to pay the balance of the written contract price on the assumption that he could have the trailer repaired); *United States of America v. C.B.C. Enterprises, Inc.*, 820 F.Supp. 242, 245 (E.D. Va. 1993) (the installation of 15 cabinets despite knowledge of the non-conformities was inconsistent with the seller's ownership and constituted an acceptance of all 19 cabinets); *ASK Techs., Inc. v. Cablescope, Inc.*, 2003 WL 22400201, * 1 (S.D.N.Y. 2003) (notwithstanding numerous problems with the computer system, buyer's written notice of non-conformities, and buyer's refusal to pay, buyer's continued use of the system for several months thereafter "belies unequivocal rejection or revocation of the goods . . . [and] was constructive acceptance.")

21.  Having accepted the Machine, Marlyn waived any rights it may have had pursuant to A.R.S. § 47-2601. A.R.S. §§ 47-2601 to 2607.

22.  Under Arizona's U.C.C., the buyer must "accept and pay in accordance with the terms of the contract." A.R.S. § 47-2301.  Marlyn was required to pay the balance of the $585,000 purchase price upon receipt of the Comprima 230 on July 15, 2004.  Marlyn has not paid that amount.

23.  Rejection of goods is governed by A.R.S. § 47-2602, which provides that:

A. Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

B. Subject to the provisions of §§ 47-2603 and 47-2604 on rejected goods:

1. After rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and

2. If the buyer has before rejection taken physical possession of goods in which  he does not have a security interest under the provisions of this chapter (subsection C of § 47-2711), he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

3. The buyer has no further obligations with regard to goods rightfully rejected. *Id.*; *Pace v. Sagebrush Sales Co.*, 560 P.2d at 792 (finding a four-month delay in providing notice of alleged defects in lumber that had been delivered and accepted was unreasonable).

24. Under A.R.S. § 47-2605(A)(1), "[t]he buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach . . . [w]here the seller could have cured if stated seasonably . . . ."

25. A.R.S. § 47-2607 provides that:

A. The buyer must pay at the contract rate for any goods accepted.

B. Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of the non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured. . . .

C. Where a tender has been accepted:

1. The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy; [and]

\*          \*          \*

D. The burden is on the buyer to establish any breach with respect to the goods accepted.

A.R.S. § 47-2607.

26. Marlyn did not effectively reject the Machine based on the powder found in the Machine's cabinet or based on scratches on the Machine's frame, because there is no evidence that Marlyn informed IMA of that alleged defect within a reasonable time. A.R.S. § 47-2605.

27. In July 2004, Marlyn informed IMA about its concerns with the rust. Marlyn, however, did not notify IMA that it was rejecting the Comprima 230 tablet press based on that issue. IMA addressed the rust issue and believed it had been resolved.

28. In July 2004, Marlyn conveyed to IMA its concerns that the Machine contained electrical components dated 1998 or 1999. IMA made arrangements to replace those electrical components and expected payment in full upon their replacement. Even assuming that

1   Marlyn's acceptance of the Machine was based on a reasonable assumption that an alleged non-

2   conformity, dated electrical components, would be seasonably cured, Marlyn did not effectively

3   reject the Machine because IMA seasonably provided the replacement parts but Marlyn refused

4   to permit IMA to install those parts.

5          29.  Marlyn did not mention that IMA should take back the Machine until April

6   or early May 2005. This was roughly ten months after the Machine had been installed, modified,

7   and used by Marlyn to produce SAMe tablets.  Lehmann never demanded that IMA take back

8   the Machine. But rather, he suggested in April or May of 2005, that IMA could take back the

9   Machine *unless* it gave Marlyn a bigger discount.

10          30.  Marlyn accepted, and did not effectively reject, the Machine and took

11   action that was inconsistent with IMA's ownership of the Machine.  A.R.S. § 47-2602(A)(3).

12    Marlyn did not give timely notice that it was rejecting the Machine.  A.R.S. § 47-1202, § 47-

13   2602.

14                    **D.  Revocation of Acceptance**

15          31.  A.R.S. § 47-2608 governs revocation and provides that:

16          A.  The buyer may revoke his acceptance of a lot or commercial unit
            whose nonconformity substantially impairs its value to him, it he has
17          accepted it:

18          1.  On the reasonable assumption that its nonconformity would be cured
            and it has not been seasonably cured;
19
            *          *          *
20
            B.  Revocation of acceptance must occur within a reasonable time after
21          the buyer discovers or should have discovered the ground for it and before
            any substantial change in condition of the goods which is not caused by
22          their own defects.  If is not effective until the buyers notifies the seller of
            it.
23
            C.  A buyer who so revokes has the same rights and duties with regard to
24          the goods involved as it he had rejected them.

25
26          32.  Marlyn has not met its burden with respect to any of the requirements for

     effective revocation.
27
28          33.  There is no evidence that the Machine's alleged non-conformity impaired

1   its value to Marlyn.  Rather, Marlyn has used the Machine for over four years and has produced
2   over 225,000,000 SAMe tablets on the Machine.

3          34.   Marlyn has not shown that it accepted the Machine on the reasonable
4   assumption that the non-conformity would be seasonably cured. A.R.S. § 47-2608.  Marlyn
5   considered the non-conformity that the Machine was not "new." There is no evidence that
6   Marlyn had a reasonable assumption that IMA would provide a "new" or different machine to
7   Marlyn after it accepted the Machine. Additionally, IMA addressed Marlyn's concerns
8   regarding rust, the aged electrical components, and performed warranty work on the Comprima
9   230.  But see, *Irrigation Motor and Pump Co. v. Belcher*, 29 Colo. App., 483 P.2d 980 (Colo.
10  App. Ct. 1971) (finding revocation effective where buyer gave seller opportunity to repair the
11  machine and withheld revocation of acceptance until it became clear seller would not perform).
12  Significantly, Marlyn complained about the age of the electrical components in the Machine.
13  Even assuming that the dated electrical components were a non-conformity, they did not
14  substantially impair the value of the Machine and IMA "seasonably cured" that alleged non-
15  conformity by providing replacement parts which Marlyn refused to permit IMA to install.
16  A.R.S. § 47-2608.

17         35. Even assuming Marlyn revoked acceptance, Marlyn has not established that
18  it did so "before any substantial change in condition of the goods which is not caused by their
19  own defects."  A.R.S. 47-2608.  The Machine was modified at Marlyn's request when it was
20  installed in July of 2004. The modification included punching a hole in the Machine's cover.
21  This modification was not related to a defect in the Machine. Crozier testified that Lehmann did
22  not mention that IMA should take back the Machine until late April or early May 2005.  This
23  was roughly ten months after the Machine had been installed, modified, and used by Marlyn.
24  Lehmann's testimony also makes clear that he never demanded that IMA take back the
25  Machine. But rather, he suggested in April or May of 2005, that IMA could take back the
26  Machine *unless* it gave Marlyn a bigger discount.

27         **E.  Damages**
28         36. Under A.R.S. § 47-2709, "Action for Price," provides that in pertinent part

that:

> A. When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price:
>
> 1. Of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer.

A.R.S. § 47-2709. Under A.R.S. § 47-2710, "[i]ncidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

37. In Arizona, the general rule is that an award of prejudgment interest on a liquidated claim is a matter of right rather than discretion. *Alumaguard Corp. v. Road Safety Products Distributing, Inc.*, 2008 WL 2721152, * 4 (Az. Ct. App. 2008); *Paul R. Peterson Constr. Inc., v. Arizona Carpenters Health and Welfare Trust Fund*, 179 Ariz. 474, 484, 880 P.2d 694, 704 (Az. Ct. App. 1994) (internal citations omitted); *Trimble v. American Sav. Life Ins. Co.*, 152 Ariz. 548, 557, 733 P.2d 1131, 1140 (Az. Ct. App. 1986) (stating that the "general rule in Arizona is that a liquidated claim entitles its holder to prejudgment interest"). The issue is whether the claim itself is liquidated. A difference between the amount awarded as damages and the amount originally demanded does not make the claim unliquidated. *Suciu v. AMFAC Distr. Corp.*, 138 Ariz. 514, 521, 675 P.2d 1333, 1340 (Az. Ct. App. 1983) (noting that claim was liquidated despite difference between amount demanded and damages awarded by jury.)

38. A.R.S. § 12-341.01(A) provides that "[i]n any contested action arising out of contract . . ., the court may award the successful party reasonable attorney fees. . . ." A.R.S. § 12-341 provides that "[t]he successful party to a civil action shall recover from his adversary all costs expended or incurred therein unless otherwise provided by law."

39. Under A.R.S. § 44-1201(A), "[i]nterest on any loan, indebtedness, judgment or other obligation shall be at the rate of ten percent per annum, unless a different rate is contracted for in writing . . . ."

40. IMA is entitled to Judgment in its favor and against Marlyn on its claim

1  for breach of contract (Count I), and on Marlyn's counterclaim for rejection or revocation of

2  acceptance.

3      41.  Marlyn is required to pay IMA the full contract price for the Machine and

4  Additional Items under A.R.S. § 47-2607, and IMA is entitled to recover from Marlyn the full

5  price of the Machine and the Additional Items, plus incidental damages, under A.R.S. § 47-

6  2709.

7      42.  IMA is entitled to Judgment against Marlyn in the amount of

8  $484,974.32[10], plus interest at the legal rate of 10% per annum from October 14, 2008 until the

9  Judgment is paid in full.

10     43.  IMA is entitled to judgment against Marlyn in the amount of its costs and

11  reasonable attorneys' fees pursuant to A.R.S. § 12-341.01(A), plus interest from the date

12  Judgment is entered.

13     44.  A.R.S. § 44-1201 sets the interest rate at ten percent simple interest per

14  annum. *Collins v. D.R. Horton, Inc.*, 361 F.Supp.2d 1085, 1094 (D. Ariz. 2005), *affirmed by* 505

15  F.3d 874 (9th Cir. 2007).

16     45.  Because the Court finds that IMA is entitled to relief on Count I of the

17  Complaint, it need not consider IMA's unjust enrichment claim, Count II.

18         Accordingly,

19     **IT IS ORDERED** directing the Clerk to enter a separate Judgment, pursuant

20  to Rules 52(a) and 58(b), Fed.R.Civ.P., in favor of Plaintiff IMA North America, Inc. and

21  against Defendant Marlyn Nutraceuticals, Inc. in the sum $484,974.32, plus simple interest at

22  a rate of 10% per annum from October 14, 2008 until the Judgment is paid in full.

23     **IT IS FURTHER ORDERED** awarding to IMA its reasonable attorneys' fees

24  and reasonable non-taxable expenses incurred in this case not previously awarded due to a

25  discovery sanction against Marlyn . IMA shall file with the Clerk an Attorney's Fees

26

27     [10] This amount reflects $340,048.80 in principal for the Machine itself, plus $144,590.61
   in accrued interest as of the October 14, 2008 trial date, and $108.50 in principal for the

28  Additional Items, plus $226.41 in accrued interest as of October 14, 2008.

Application and Affidavit, consistent with LRCiv 54.2 by **5:00 p.m. on Monday, February 23, 2009**.  If Marlyn has an objection to IMA's Application and Affidavit, it shall file an Objection thereto by **5:00 p.m. on Monday, March 23, 2009**. IMA's Reply, if any, shall be filed by **5:00 p.m. on Monday, April 6, 2009**. Absent good cause shown, the failure to timely file the subject Application and Affidavit or Objection may result in the summary denial or award of the attorneys' fees requested. Attorneys' fees shall be awarded by separate order.

Dated this 22nd day of January, 2009.

Lawrence O. Anderson
United States Magistrate Judge